VICKI PUMMELL,

      Plaintiff,

                                   Civil Action 2:15-cv-03034

      v.                         Chief Magistrate Judge Elizabeth P. Deavers

RONETTE BURKES, *et al.*,

      Defendants.

## OPINION AND ORDER

Plaintiff, Vicki Pummell, brings this civil rights action under 42 U.S.C. § 1983 alleging violations of her Eighth Amendment and Fourteenth Amendment rights, as well as a state law claim of gross negligence. (ECF No. 1.) Plaintiff seeks monetary damages against Defendants Ronette Burkes, Mierla Crisan, "FNU [First Name Unknown] Pennington,"[1] and John/Jane Doe 1-3.[2] This matter is before the Court for consideration of Defendants' Motion for Summary Judgment. (ECF No. 64.) For the reasons that follow, Defendants' Motion for Summary Judgment is **GRANTED**.

### I. BACKGROUND

Plaintiff was an inmate at the Ohio Reformatory for Women ("ORW") at all times relevant to this action. (Complaint at ¶ 4, ECF No. 1 ("Compl.").) Plaintiff has since been

---

[1] His Answer indicates that he is David Pennington. (ECF No. 3, at p. 1)
[2] To date, Plaintiff has not named or served any of the John/Jane Doe(s).

released from custody.[3]  On November 29, 2015, Plaintiff, who is represented by counsel, filed this action for money damages under 42 U.S.C. § 1983 for deliberate indifference to her serious medical needs against Defendants Dr. Mierla Crisan, (first name unknown) Pennington, John/Jane Doe(s) ("Doe"), and Defendant Ronette Burkes, ORW's Warden at all relevant times in her official capacity.  (*See generally id.*)  Defendants Crisan, Pennington, and Doe were medical personnel employed by or acted as agents of the ORW.  (*Id*; Defendants' Answer at ¶ 2, ECF No. 4 ("Ans.").)  Plaintiff also asserts a state law claim of gross negligence.  (*See generally* Compl.)  Plaintiff specifically alleges that Defendants were deliberately indifferent to her serious medical needs as it relates to a metallic aneurysm clip implanted prior to her incarceration and surgically removed during her incarceration.  (*Id.*)

The following is a summary of the events at issue in this motion, some of which are drawn from Plaintiff's Complaint.  (ECF No. 1.)  Although the Court relies on Plaintiff's Complaint to help develop the basis of the events at issue, it is not verified.  The Court does not rely upon the Complaint as evidence at the summary judgment stage.[4]

---

[3] According to the Ohio Department of Rehabilitation & Correction Online Offender Search, Plaintiff was released on November 18, 2015.
https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/W085205

[4] *See Turnery v. Catholic Health Initiatives*, 35 F. App'x 166, 168 (6th Cir. 2002) (noting that "a party's *verified* complaint may be considered as evidence in establishing a genuine issue of material fact") (emphasis added); *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (indicating that a "verified complaint . . . carries the same weight as would an affidavit for the purposes of summary judgment . . . to the extent that it is based on personal knowledge."); *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006) ("Once the moving party has [made a case for summary judgment], the nonmoving party cannot rest on his pleadings but must identify specific facts that can be established by admissible evidence, which demonstrates a genuine issue for trial."); *Berri v. Dearborn Public Schools*, 103 F. Supp. 3d 855, 858 n.1 (E.D. Mich. Apr. 13, 2015) (finding that plaintiff's complaint could not support his factual assertions because it was not verified, sworn to, nor made under penalty of perjury).

In 2005, before Plaintiff was incarcerated, she suffered a brain aneurysm which resulted in her receiving a metallic implant and screws on the left side of her head.  (Compl. at ¶ 10; Dfts' Mot., Exhibit C.)  On February 18, 2014, Plaintiff went to the infirmary "complaining of right hip pain/sprain."  (Dfts' Mot., Exhibit D.)  The medical record indicates there was no swelling or deformity to the area.  (*Id.*)  Furthermore, an x-ray of Plaintiff's right hip revealed no acute osseous injury.[5]  (Dfts' Mot., Exhibit E.)  Plaintiff stated Ibuprofen and Tylenol do not provide her relief, so the Nurse prescribed Tylenol #3.[6]  (Dfts' Mot., Exhibit D.)  Plaintiff requested more Tylenol #3 on the following dates:  March 6, 2014, March 9, 2014, March 13, 2014, March 18, 2014, and March 20, 2014.  (Dfts' Mot., Exhibits F, G, & H; Dfts' Mot., Declaration of Mirela Crisan, M.D., at ¶ 7 ("Crisan Decl.").)  On March 20, 2014, Plaintiff specifically stated "I cannot take this pain anymore."  (Dfts' Mot., Exhibit H.)

On April 15, 2014, Plaintiff was seen at Nurse Sick Call ("NSC") at ORW where she complained that her dosage of Tylenol #3 was not enough and that her right hip had swollen.  (Dfts' Mot., Exhibit K.)  The Nurse noted there was no swelling observed in Plaintiff's hip on this date.  (*Id.*)  On April 20, 2014, Plaintiff was again seen at NSC.  (Dfts' Mot., Exhibit L.)  Plaintiff avers that on this day she "experienced a severe headache and noticed swelling on the left side of her head, the location of her implant."  (Compl. at ¶ 13; Dfts' Mot., Exhibit L.)  The Nurse did not observe swelling, but noted a subdermal extracranial mass proximal to indentation of surgical repair.  (Dfts' Mot., Exhibit L.)  Plaintiff was then transported to Ohio State

---

[5] Another x-ray on April 10, 2014 revealed the same result.  (Dfts' Mot., Exhibit I.)  Furthermore, a CT scan on April 10, 2014 revealed no abnormalities or misalignment to Plaintiff's right hip.  (Dfts' Mot., Exhibit J.)

[6] Tylenol #3 is a medicinal tablet made up of a combination of acetaminophen, codeine, and caffeine.  *See* Alex Mitchell, et al., *A Randomized Controlled Trial Comparing Acetaminophen plus Ibuprofen Versus Acetaminophen plus Codeine plus Caffeine after Outpatient General Surgery*, 206 J. AM. COLLEGE SURGEONS 472, 472 (2008).

University Wexner Medical Center ("OSUMC" or "OSU"). (Compl. at ¶ 13; Dfts' Mot., Exhibits M & N.)

OSU staff noted that Plaintiff complained of a "left-sided headache," a "history of an aneurysm," and that the Tylenol and Motrin from ORW offered her "no relief of her symptoms." (Dfts' Mot., Exhibit N.) On physical exam, Plaintiff's head was found to be in normal condition without injury or abnormalities. (*Id.* ("Physical Exam – Head: Normocephalic and atraumatic"); Crisan Decl., at ¶ 12.) OSU staff further reported that "[s]uspicion for subarachnoid hemorrhage or aneurysmal bleed is low, but given history, will need to exclude bleed." (Dfts' Mot., Exhibit N.) Accordingly, a CT scan was performed that showed no problems and indicated there was no movement or protrusion of Plaintiff's metal implant.[7] (*Id.*) Because of the negative CT scan, OSU staff performed a lumbar puncture on Plaintiff to ensure she was not experiencing an aneurysm. (*Id.*) The lumbar puncture findings did not demonstrate any intracranial hemorrhage. (*Id.*) Furthermore, OSU staff opined that given Plaintiff's "history of migraines, this is more likely to be a migraine, given there are no other concerning findings on imaging or lab testing." (*Id.*) Additionally, OSU staff noted that Plaintiff felt "improved after migraine cocktail."[8] (*Id.*)

On May 26, 2014 Plaintiff was seen by Defendant Crisan, who referred her to mental health services for "excessive anxiety and worrying about her head." (*Id.* at ¶ 16; Ans. at ¶ 16 (admitting Defendant Crisan referred Plaintiff "to mental health for excessive anxiety and worrying about her head[,]"); Crisan Decl., at ¶ 14–18.) Plaintiff further contends that based on "[Defendant] Crisan's lack of concern and not bothering to look at her head" she filed a

---

[7] The CT scan showed "stable postsurgical changes from previous left frontal craniotomy and aneurysm clipping in the region of the left posterior communicating artery." (Dfts' Mot., Exhibit N.)

[8] A "migraine cocktail" is "usually a combination of Prochlorperazine (anti-psychotic)[,] Indomethacin (NSAID)[,] and Caffeine[.]" (Crisan Decl., at ¶ 12.)

complaint with Defendant Pennington whose response Plaintiff alleges was "Don't worry, you've been referred to Mental Health."  (Compl. at ¶ 17.)

On May 29, 2014, at 11:00 p.m.,[9] Plaintiff complained of a "pounding/throbbing" headache at a "4" on a scale of 1 to 10.  (Compl. at ¶ 18; Plt.'s Resp., Exhibit 3; Dfts' Mot., Exhibit P.)  Plaintiff was examined at 12:00 a.m. on May 30, 2014.  (Dfts' Mot., Exhibit P.)  Plaintiff avers that she had dried blood on the left side of her head (Compl. at ¶ 18; Plt.'s Resp., Exhibit 3), but ORW staff noted no swelling or drainage on her head (Dfts' Mot., Exhibit P.)  The staff did note a "pea sized indention" on the left side of Plaintiff's head that was hard upon palpation.  (*Id.*)  The staff indicated that Plaintiff was given bacitracin, a topical antibiotic for minor skin infections in case there was an opening of the skin, and Tylenol #3 for pain.  (*Id.*)  Furthermore, Nurse Mathis advised Plaintiff to keep the area clean and dry.  (Dfts' Mot., Exhibit P.)  On the same day, Plaintiff refused over-the-counter medication, stating "I need something stronger for my headache."  (*Id.*)  At 6:00 p.m. that day, Nurse LeBlanc asked Plaintiff to pinpoint the spot of metal she is complaining of, and in that area Nurse LeBlanc noted no redness, edema, or drainage.  (*Id.*)  Furthermore, Plaintiff admitted to "picking at [her] head until [she] felt the metal."  (*Id.*)  Nurse LeBlanc cleaned the area, applied a Band-Aid, and advised Plaintiff to cease picking at her scalp.  (*Id.*)

The following day, May 31, 2014, Plaintiff again complained of a headache, and was given Tylenol #3 and assessed.  (Dfts' Mot., Exhibit P.)  The assessment notes indicate that "no protruding metal in scalp" was seen.  (*Id.*)  Plaintiff's concedes that a nurse and doctor both evaluated her but "found nothing" and "nothing [was] done."  (*Id.* at ¶ 19.)  After this incident,

---

[9] Plaintiff appears to reference this incident as occurring on May 30, 2014.  (Compl. at ¶ 18; Plt.'s Resp., Exhibit 3.)  However, given the time of day the incident was recorded to have begun, this appears to be a minor discrepancy.  (*See* Dfts' Mot., Exhibit P.)

Plaintiff remained in the ORW infirmary through June 2, 2014 where she was regularly monitored and given Tylenol #3 for the alleged pain, Naprosyn (muscle relaxer), and Milk of Magnesia (to relieve constipation caused by narcotics). (Dfts' Mot., Exhibit P.)

On June 2, 2014, Plaintiff was evaluated by Defendant Crisan at 11:00 a.m. (Dfts' Mot., Exhibit P.) Defendant Crisan noted a small indentation on Plaintiff's head at the location of her metal implant, where the metal can be felt but not visualized through the intact skin. (*Id.*; Crisan Decl., at ¶ 14.) Defendant Crisan also expressed concern to the Plaintiff about narcotic addiction. (Crisan Decl., at ¶ 15 ("In my opinion, [Plaintiff] is showing [a] pattern of narcotic seeking behavior in which [Plaintiff] has an emergency or comes into Nurse Sick Call, with some significant pain concern (hip, headache) about a few days after her previous narcotic pain medication expired, raising the suspicion of narcotic seeking behavior."); *see also* Dfts' Mot., Exhibit P.) Defendant Crisan also stopped Plaintiff's Tylenol #3 prescription and prescribed her ibuprofen as a less addictive alternative for pain. (Crisan Decl., at ¶ 17.) Furthermore, Defendant Crisan referred Plaintiff to Mental Health Services "to help her avoid picking at her skin as a stress relieving behavior." (*Id.* at ¶ 16.) The same day, June 2, 2014, Plaintiff filed another complaint with Defendant Pennington regarding not receiving medical attention from the infirmary. (*Id.* at ¶ 20; Pummell Aff., at ¶ 10.) Plaintiff avers that Defendant Pennington's response "advised her to make an appointment with the doctor if the problem persists." (*Id.*)

On June 4, 2014, Defendant Crisan left for vacation for three weeks. (Crisan Decl., at ¶ 19.) On June 12, 2014, while Defendant Crisan was out, Plaintiff was seen by Nurse Lemaster. (Dfts' Mot., Exhibit Q.) Plaintiff complained of headaches and a "piece of metal in [her] scalp." (*Id.*) Upon examination of Plaintiff, Nurse Lemaster noted a metal object protruding from the left scalp, describing it as "very minute . . . like the end of a staple." (*Id.*) Accordingly, Nurse

Lemaster referred Plaintiff to Dr. Stromfeld, a physician contractor on call. (*Id.*) Dr. Stromfeld examined Plaintiff, noting that a "small portion of a metallic staple" was visible and that there was no bleeding. (*Id.*) Dr. Stromfeld made a request for an outside neurological consultation.[10] (Dfts' Mot., Exhibit R.)

On June 15, 2014, Plaintiff was seen in the ORW infirmary for head lice and complaints about her head. (Compl. at ¶ 26; Plt.'s Resp., Exhibit 5; Dfts' Mot., Exhibit S.) Plaintiff was given lice treatment per ORW protocol. (Dfts' Mot., Exhibit S.) Upon examination of Plaintiff's head, the nurse noted a "yellow/brown scab" but did not visualize any metal. (*Id.*) The nurse further noted that Plaintiff began "using fingernail to access area" and she instructed Plaintiff not to "pick [at the] scab." (*Id.*) In response, the nurse noted Plaintiff stated, "I'm trying to show you it." (*Id.*) The nurse again instructed Plaintiff not to "pick [at the] scab," to which Plaintiff stated she understood/agreed. (*Id.*) Plaintiff was examined again on June 15, 2014 and was noted as having a 2 mm by 3 mm exposed metal plate on her left scalp, and that there is "no drainage, no redness, [and] no swelling." (Dfts' Mot., Exhibit T.) Plaintiff repeatedly stated that she did "not have a headache or acute pain." (*Id.*) The nurse cleaned the site of the exposed metal, applied topical bacitracin, and advised Plaintiff to contact staff

---

[10] Plaintiff maintains that this was actually the second neuro consult request made by Dr. Stromfeld. (Compl. at ¶ 24.) Without corroborating evidence, Plaintiff avers that sometime in June 2014 she was visited by Lt. Nelson, and as a result of this visit was called to Capt. Golding's office where pictures of her head injury were taken. (*Id.* at ¶ 22–23.) Plaintiff further contends without corroborating evidence that she was told to go immediately to the nurse supervisor, which she did, who then referred her to the on-duty doctor, Dr. Stromfeld. (*Id.* at ¶ 24.) Plaintiff avers that on June 5, 2014 Dr. Stromfeld wrote his first consult for her to see a neurosurgeon at OSU. (*Id.* at ¶ 25.) Plaintiff cites to Exhibit 4 of her Response in Opposition as support, but that document refers only to the June 12, 2014 examination by Dr. Stromfeld, which Defendants corroborate. (Plt.'s Resp., Exhibit 4; Dfts' Mot., Exhibits R & Q.)

immediately if bleeding occurred. (*Id.*) Additionally, the nurse noted that Dr. Stromfeld's "Neuro consult" was in the medical scheduler's box. (*Id.*)

On June 20, 2014 Plaintiff was seen at the ORW infirmary complaining of head bleeding. (Dfts' Mot., Exhibit U.) Plaintiff also presented a tissue containing two small scabs in it and stated she was advised to come to medical whenever her head was bleeding. (*Id.*) The nurse reported that no blood was visible at the metal implant site, and instructed Plaintiff not to touch that area, or that if she needed to touch the area to do so only with clean heads. (*Id.*) Plaintiff stated to the nurse that she had been given antibiotic ointment and the nurse then advised her to use it. (*Id.*) On June 24, 2014, Plaintiff complained of metal staples coming out of her left temporal area. (*Id.*) Two metal stables "sticking out" of the left temporal area were observed. (*Id.*) Dr. Stromfeld prescribed Plaintiff an oral form of Bactrim, three times a day, to prevent infection. (*Id.*)

Defendant Crisan returned from vacation on June 26, 2014 and was newly assigned to be the interim Chief Medical Officer ("CMO") for ORW. (Crisan Decl., at ¶ 20.) Part of the CMO's duties is to present consultation requests for outside specialists to the Collegial Review, which is headed by the State Medical Director (or his designee). (*Id.* at ¶ 21.) If the consultation request is approved by the Collegial Review, it is sent to the ODRC Central Office Scheduling Department which coordinates with the outside facility's scheduling department. (*Id.*) The outside facility will then provide the ODRC Central Office Scheduling Department with the medical appointment date. (*Id.* at ¶ 26.) The prison medical staff has no control over an outside facility's scheduling, including OSU. (Crisan Decl., at ¶ 26; Dfts' Mot., Dr. Eddy Report, at ¶ 5 ["Eddy Rep."].)

Upon Defendant Crisan's return on June 26, 2014, she reviewed Dr. Stromfeld's Neuro consult request for Plaintiff. (*Id.* at ¶ 23.) To present the case to the Collegial Review, Defendant Crisan needed to examine what had changed in Plaintiff's medical condition since her June 2, 2014 examination. (*Id.* at ¶ 24.) Defendant Crisan examined her scalp with sterile tweezers and felt a small metal piece outside of the skin. (*Id.*) Accordingly, Defendant Crisan agreed with Dr. Stromfeld that the consultation should be designated "as soon as possible."[11] (*Id.*) Dr. Stromfeld, therefore, placed a new consultation request on the same date of June 26, 2014. (Plt.'s Resp., Exhibit 6; Crisan Decl., at ¶ 24.) Also on the same day, Defendant Crisan presented the case to Collegial Review and it was approved by Dr. Yost. (Crisan Decl., at ¶ 25; Dfts' Mot., Exhibit W.) Dr. Yost then contacted an ODRC Medical Scheduler to coordinate with OSUMC to provide an appointment date. (*Id.*) Prior to her scheduled appointment, Plaintiff "was provided interim care by ORW staff which included antibiotics to prevent infection of the wound and pain management." (Crisan Decl., at ¶ 27; Dfts' Mot., Exhibits U & X.)

On July 17, 2014, Plaintiff was seen and advised that the neuro consult had been approved. (Dfts' Mot., Exhibit X.) Although Plaintiff communicated "multiple concerns," the nurse made a note that there was "really no evidence of recent changes over the past few weeks." (*Id.*) On July 25, 2014, Plaintiff was again seen at the ORW infirmary complaining about headaches and that the "plate in [her] head is shifting, pushing its way out." (Dfts' Mot., Exhibit X.) Plaintiff stated that she cannot sleep or eat due to pain and that "you have to get me something for this pain." (Dfts' Mot., Exhibit X.) Despite reporting being unable to eat, Plaintiff's weight was noted as stable. (*Id.*) Plaintiff also reported picking at "crusty stuff" at

---

[11] A designation of "as soon as possible" or "ASAP" means that it is "to be scheduled within 2 weeks or next available clinic." (Plt.'s Resp., Exhibit 7.)

her metal implant area, and the nurse advised Plaintiff to quit touching the area. (*Id.*) Nevertheless, Plaintiff was observed touching her scalp several times during the assessment. (*Id.*) Plaintiff was prescribed Tylenol #3 for 14 days for pain. (*Id.*) While Plaintiff was at the medicine window picking up the Tylenol #3 nurses observed her "dancing and laughing." (*Id.*)

On August 14, 2014, Plaintiff had her consult with a neurosurgeon at OSU, during which she was admitted and scheduled for removal of the plate and wound revision surgery the following day. (Dfts' Mot., Exhibit Y; ECF No. 64, Deposition of Ciaran James Powers at pg. 5–6 ("Powers Depo.").) Plaintiff was seen at OSU by Dr. Powers, who noted there was a small opening along Plaintiff's prior incision and that the metal plate was visible underneath that opening. (Powers Depo., at pg. 12.) Dr. Powers also noted that there was a little bit of redness, but it was not "frankly infected." (*Id.* at pg. 12–13.) Dr. Powers further noted that there "was no evidence of pus or induration."[12] (*Id.* at pg. 13.) On August 15, 2014, the exposed portion of Plaintiff's metal implant was removed, and she underwent wound revision. (Dfts' Mot., Exhibit Y.) Cultures were taken, and the wound was debrided. (Dfts' Mot., Exhibits Y & Z.) Post-procedure, Plaintiff maintained "eating, toileting, and ambulating without difficulty" and was "adequately controlled on oral medications." (Dfts' Mot., Exhibit Y.)

The cultures indicated the presence of staph epidemidis and a 6-week course of IV treatments was recommended. (Dfts' Mot., Exhibit Y; *see also* Powers Depo., at pg. 6 [indicating that cultures collected from Plaintiff's wound site "were positive for skin flora[.]"]; ECF No. 64, Declaration of Doctor Kurt Stevenson, M.D., at ¶¶ 5b–f (noting that Plaintiff's culture "came back positive for staphylococcus, coagulase negative") ["Stevenson Decl."].)[13]

---

[12] Induration means swelling of the skin. (Powers Depo., at pg. 13.)
[13] When Dr. Powers was asked in his deposition whether Plaintiff had a staph infection his response was "I think that's the organism, yeah." (Powers Depo., at pg. 6.)

The cultures did not come back positive for MRSA. (Stevenson Decl., at ¶ 5d.) Dr. Stevenson, an OSU medical doctor and professor, was asked to evaluate Plaintiff's cultures and consult on management of her scalp wound after her surgery. (*Id.* at ¶¶ 2, 4.) Dr. Stevenson noted that staphylococci, coagulase negative "are a part of the normal flora of human skin," meaning they "normally live[] on the skin's surface." (*Id.* at ¶ 5c.) Furthermore, he noted that because of "their presence on the skin normally, these bacteria will often cause infections of implanted devices with skin surface exposure." (*Id.*)

At the time of surgery, Plaintiff's C-reactive ("CRP")[14] and Erythrocyte Sedimentation Rate ("ESR")[15] were at normal levels, meaning there was limited sign of active inflammation. (*Id.* at ¶ 5g; Dfts' Mot., Exhibit Y.) Plaintiff's Complete Blood Count ("CBC") was also normal.[16] (Stevenson Decl., at ¶ 5i; Dfts' Mot., Exhibit Z.) Dr. Stevenson noted that these levels indicated to him that the "level of infection at the site of [Plaintiff's] surgical implant was low or mild." (Stevenson Decl., at ¶ 5j; Dfts' Mot., Exhibit Z.) The primary risk to Plaintiff was osteomyelitis (infection of the bone) because her metal implant was contiguous to her skull. (Stevenson Decl., at ¶ 6.) The risk was that the staphylococcus, coagulase negative could enter Plaintiff's surgical site and infect her bone. (*Id.*) Dr. Stevenson preferred the IV treatment to oral antibiotics because "IV antibiotics provide much improved penetration into the bone." (*Id.* at ¶ 7.)

---

[14] "CRP measures the concentration in the blood of a protein that indicates inflammation caused by illness or infection. When a patient has an infection, the CRP level is generally raised." (Stevenson Decl., at ¶ 5h.)

[15] ESR "indicates inflammation caused by illness or infection. When a patient has an active infection, the ESR is generally raised." (Stevenson Decl., at ¶ 5h.)

[16] The Complete Blood Count includes the White Blood Count, which if raised is an indicator of infection. (Stevenson Decl., at ¶ 5i.)

Plaintiff was discharged from OSU on August 19, 2014 and transferred to Columbus Medical Center ("CMC") for treatment. On September 26, 2014 she was discharged from CMC and sent to the ORW infirmary. On October 8, 2014 she was released from the infirmary. In September 2014, Plaintiff had a CT angiogram because of complaints she made about a severe left-sided headache. (Dfts' Mot., Exhibit BB.) The CT angiogram showed no evidence of drainage or erythema. (*Id.*) Dr. Stevenson indicated that Plaintiff's CRP, ESR, CBC, and bloodwork was monitored during her treatment course as standard practice and that all "remained at normal levels in the weeks following the procedure indicating good to [sic] tolerance to the medications and good response to therapy." (Stevenson Decl., at ¶ 11.)

Plaintiff had a follow-up appointment with Dr. Stevenson via telemedicine on October 3, 2014. (*Id.* at ¶ 12.) Dr. Stevenson noted that "her scalp/cranial wound [was] well-healed without erythema or drainage indicating good resolution of local infection." (*Id.*; Dfts' Mot., Exhibit AA.) Plaintiff's bloodwork was also found to be normal. (*Id.*) Dr. Stevenson ordered the IV treatments to be finished and switched Plaintiff to oral antibiotics for 14 days. (*Id.*) Plaintiff had another follow-up appointment with Dr. Stevenson via telemedicine on November 4, 2014. (Stevenson Decl., at ¶ 13.) Dr. Stevenson noted that Plaintiff was "doing very well" and "had no swelling, erythema, warmth or drainage from scalp wound." (*Id.*) Dr. Stevenson further noted that Plaintiff "voiced no complaints" and that her bloodwork "levels remained normal off of antibiotics indicating good resolution of local infection." (*Id.*)

On May 7, 2015, Defendant Crisan examined Plaintiff regarding a new concern with her metal implant. (Dfts' Mot., Exhibit DD.) Defendant Crisan examined Plaintiff's scalp, noting no open wounds but that the metal implant could be felt under the skin. (*Id.*) On the same date, Defendant Crisan created a consultation request for Plaintiff to see Dr. Powers. (*Id.*) Plaintiff

12

was seen by Dr. Powers in June 2015 via telemedicine. (Powers Depo., at pg. 6; Dfts' Mot., Exhibit DD.) At the telemedicine appointment with Dr. Powers, Plaintiff complained "about a painful bump on her prior incision." (Powers Depo., at pg. 6.) During the appointment, Dr. Powers noticed Plaintiff "constantly touching the scalp area of concern and advised her to avoid doing this to prevent skin breakdown and infection." (Dfts' Mot., Exhibit DD.) Follow-up x-rays revealed no exposed hardware and no need for surgical intervention. (Dfts' Mot., Exhibit EE.)

On November 18, 2015, Plaintiff was released from ORW. (Dfts' Mot., Exhibit A.) The following day, November 19, 2015, Plaintiff began "using" again and purchased Percocet (oxycodone and acetaminophen) from the "street." (Dfts' Mot., Exhibit FF.) On November 28, 2015, Plaintiff admitted to using the following drugs in the previous thirty days: heroin, Tylenol #3, fentanyl, Norco (hydrocodone/paracetamol), and Percocet. (*Id.*) Plaintiff also tested positive for illicit drugs several times since her release from ORW. (Dfts' Mot., Exhibit GG.) On November 20, 2017, Plaintiff's counsel confirmed that she had not seen a neurologist since her release from ORW. (Dfts' Mot., Exhibit HH; ECF No. 64, Declaration of Kelly Brogan, at ¶¶ 3–4 ["Brogan Decl."].)

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of proving that no genuine issue of material fact exists falls on the moving party, "and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stransberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710

(6th Cir. 2001); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317-324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however 'do more than simply show that there is some metaphysical doubt as to the material facts,'. . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a 'genuine' dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (citations omitted).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stransberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III. ANALYSIS

### A. Defendant Burkes and Claim for Gross Negligence

As an initial matter, Plaintiff's Response in Opposition to Defendant's Motion fails to address her claims against Defendant Burkes and her state law claim of gross negligence. (*See*

14

*generally*, ECF No. 68.)  Accordingly, these claims are considered waived, and the Court will not consider them in ruling on Defendants' Motion.  Furthermore, neither Plaintiff's Complaint, nor anything else she presents to the Court, shows any personal involvement by Defendant Burkes in the alleged misconduct.  While Plaintiff alleges in her Complaint that Defendant Burkes failed to properly train and supervise ORW's medical personnel, Plaintiff offers no evidence whatsoever in support of those claims.  At most, Plaintiff appears to imply that Defendant Burkes is liable under Section 1983 because of her supervisory position.  Under Section 1983, however, supervisory liability is unavailable.  *Rizzo v. Goode*, 423 U.S. 362, 371, 373–76 (1976).  Accordingly, Defendant Bukes is entitled to summary judgment in her favor on the claims against her.[17]  Likewise, as Plaintiff fails to offer any evidence in support of her state law claim of gross negligence, Defendants are entitled to summary judgment in their favor on that count.  (Compl. at ¶¶ 58–62 ["Count Four"].)

**B.  Drug Use**

In their Motion for Summary Judgment, Defendants point out that "Plaintiff was admitted to custody . . . for convictions of theft, tampering with evidence, and drug trafficking."  (ECF No. 64, Defendants' Motion, at pg. 1 & Exhibit A ["Dfts' Mot."].)  Specifically, Defendants go into detail regarding Plaintiff's drug use and drug-seeking behavior:

> [P]rior to incarceration, Plaintiff was introduced to "pain meds," namely, "Tylenol 3" by Dentist, which led Plaintiff to "doctor-shopping" to get opiates.  (Exhibit FF, P. 3).  Plaintiff admitted to "doctor shopping" and saying, "I had pain when I didn't . . . whatever it took."  (Exhibit B, P. 7).  Prior to

---

[17] Furthermore, Defendant Burkes is entitled to Eleventh Amendment Immunity, as well as Ohio's Sovereign Immunity to the extent Plaintiff brings claims against Defendant Burkes in her official capacity.  Eleventh Amendment Immunity and Ohio's Sovereign Immunity precludes monetary damages against Defendants in their official capacities.  Additionally, the Eleventh Amendment bars suits against an unconsenting state or one of its agencies or departments, regardless of the relief sought.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

incarceration, Plaintiff admitted to shooting heroin every morning and smoking crack for years, regularly once a week. *Id.* While incarcerated from 2012 to 2015 at the [ORW], Plaintiff's extensive history of addiction to opiates is documented in medical and mental health records. (Exhibit C).

(Dfts' Mot., at pg. 1.) Furthermore, Defendants indicate that Plaintiff was at times denied certain pain medication at the ORW infirmary due to her history with drugs. (*See generally* Dfts' Mot.) Plaintiff contends that the references to, and arguments that, Plaintiff was drug-seeking "are attacks on her credibility and should not be given any weight or consideration by this Court." (ECF No. 68, Plaintiff's Response in Opposition, at pg. 7 ["Plt.'s Resp."].) The Court finds that Plaintiff's drug use and drug-seeking behavior may be given weight and consideration under these circumstances because Defendants support their assertions with specific evidence and any drug-seeking behavior on Plaintiff's part may have played a role in decisions made by Defendants regarding Plaintiff's medical care. Defendants have authenticated all medical documents related to Plaintiff's relevant drug history in accordance with Rule 901(a) of the Federal Rules of Evidence. Furthermore, evidence of Plaintiff's drug history is relevant to Defendants' defense under Rule 401 of the Federal Rules of Evidence.[18]

---

[18] Defendants describe the relevancy of these documents as follows:

At the forefront of her Eighth Amendment claim, in contra evidence, Plaintiff claims Defendant Crisan denied her proper medical care during her June 2, 2014 examination and instead 'humiliated' her by addressing addiction and anxiety concerns. One of the factors weighed in her June 2, 2014 examination to discontinue Plaintiff's Tylenol 3 prescription stemmed from Plaintiff's history of substance abuse, multiple convictions relating to controlled substances, as well as first-hand observations of Plaintiff's claims of constant and debilitating pain not supported by objective evidence. Exhibits related to Plaintiff's drug-seeking behavior are relevant to the instant case under [Federal Rule of Evidence] 401, as they evidence Plaintiff's lengthy substance abuse and further support the reasonableness of Defendant Crisan's suspicions that Plaintiff was attempting to obtain and abuse narcotics. They also show that addiction concerns are an ongoing medical concern within Plaintiff's medical care, in contrast to her issues with her metal plate which have not necessitated further treatment post incarceration, further

### C. Plaintiff's Affidavits

Plaintiff submitted two Affidavits in conjunction with her Response in Opposition to Defendants' Motion. (Plt.'s Resp., Exhibit 1, Affidavit of Vicki Pummell ["Pummell Aff."], Exhibit 2, Affidavit of David B. Yablonsky, D.O. ["Yablonsky Aff."]). Neither of the Affidavits were signed at the time Plaintiff first submitted them. (*Id.*) Plaintiff's only statement in her Response in Opposition relating to the lack of signatures on the Affidavits was that "both Affidavits will be signed then filed, in the meanwhile, Plaintiff submits these unsigned affidavits as proffers of what the originals will state." (Plt.'s Resp., at pg. 2.) Plaintiff, therefore, provided no explanation as to why the Affidavits were not signed at the time of submission.

Unsigned affidavits do not comply with Rule 56(e) of the Federal Rules of Civil Procedure. *Sfakianos v. Shelby Cty. Gov't*, 481 F. App'x 244, 245 (6th Cir. 2012) (citing *Nassif Ins. Agency, Inc. v. Civic Prop. & Cas. Co.*, No. 03-2618, 2005 WL 712578, at *3 (6th Cir. 2005)). "An 'unsigned affidavit' is a contradiction in terms. By definition an affidavit is a 'sworn statement in writing made . . . under an oath or an affirmation before . . . an authorized officer." *Sfakianos*, 481 F. App'x at 245 (citing *Mason v. Clark*, 920 F.2d 493, 495 (8th Cir. 1990)). The unsigned affidavits, therefore, may not be considered by the Court in ruling on Defendant's Motion.

Plaintiff, however, did eventually submit a signed copy of each affidavit. (ECF Nos. 69 & 71.) Plaintiff submitted a signed copy of the Pummell Affidavit (*i.e.*, Plaintiff's own Affidavit) on June 4, 2018 (ECF No. 69), four days after filing the Response in Opposition and

---

supporting Defendant Crisan's judgment to address such issues during her examination.

(ECF No. 70, Defendants' Reply, at pg. 16–17 ["Dfts' Reply"].) The Court agrees with this assessment.

prior to Defendants' filing of their Reply on June 12, 2018 (ECF No. 70). Plaintiff submitted a signed copy of the Yablonsky Affidavit on July 12, 2018 (ECF No. 71), almost a month and a half after filing the Response in Opposition and exactly a month after Defendants' filing of their Reply.

Plaintiff submitted these late Affidavits without the permission of the Court and in contravention of Southern District of Ohio Local Civil Rule 7.2(b), which provides in pertinent part:

> When proof of facts not already of record is necessary to support or oppose a motion, all evidence then available shall be discussed in, and *submitted no later than, the primary memorandum of the party relying upon such evidence*. . . . If evidence is not available to meet this schedule or circumstances exist as addressed by Fed. R. Civ. P. 56(d), counsel shall consult one another and attempt to stipulate to a joint motion for extension of the schedule established by this Rule; failing agreement, counsel shall promptly bring the matter to the attention of the Court.

S.D. Ohio Civ. R. 7.2(b) (emphasis added). The proper time for Plaintiff to submit the affidavits was, therefore, with her opposing memorandum. To accept her late submissions would contravene the procedure set forth in the Local Civil Rules, and provide Plaintiff with an unfair advantage, as Defendants were forced to file their Reply without the benefit of the signed Yablonsky Affidavit, at the very least. Furthermore, Plaintiff provided no discernible reason as to why the signed Affidavits could not have been attached to her opposing memorandum.

Nevertheless, given that the Pummell Affidavit was submitted less than a week after Plaintiff's Response in Opposition, and before Defendants' Reply, in the limited circumstances present in this particular case, the Court will consider the Pummell Affidavit in ruling on Defendants' Motion. *See Shepard v. Frontier Commc'ns Servs., Inc.*, F. Supp. 2d 279, 284–85 (S.D.N.Y. 2000) (holding that plaintiff's affidavit, which was unsigned when served on defendants, would be considered because a signed copy was later filed with the court). The

Yablonsky Affidavit, however, was submitted substantially later, well after Defendants' deadline to file their Reply, and the time at which they had in fact so replied, had passed. Under these circumstances, the Court will not consider the Yablonsky Affidavit in ruling on Defendants' Motion. The Yablonsky Affidavit included an attached letter purportedly from Dr. Yablonsky to Plaintiff's Attorney Wesley Miller. (Yablonsky Aff.) The Court concludes that the defect attributed to the unsigned affidavit affects the attached letter. The Court, therefore, will also not consider the letter from Dr. Yablonsky to Plaintiff's Attorney Wesley Miller.

Even if the Court were to consider the Yablonsky Affidavit and attached letter, each would fail to demonstrate a genuine issue of material fact sufficient to overcome a grant of summary judgment. The Yablonsky Affidavit includes the assertion by Dr. Yablonsky that Defendants "deviation from the acceptable and appropriate standard of care in the treatment of [Plaintiff] demonstrates deliberate indifference to her serious medical needs." (Yablonsky Aff., at ¶ 7.) Deliberate indifference, however, "is a legal term . . . [and it] is the responsibility of the court . . . to define legal terms." *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994). Dr. Yablonsky, therefore, may not opine on the question of deliberate indifference because it expresses a legal conclusion. *See id.* at 1352–54.

### D. Deliberate Indifference

It is well established that "[t]he Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward [their] serious medical needs." *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotations and citations omitted). A claim for deliberate indifference "has both objective and subjective components." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). The United States Court of Appeals for the Sixth Circuit has explained:

The objective component mandates a sufficiently serious medical need. [*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).] The subjective component regards prison officials' state of mind. *Id.* Deliberate indifference "entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 895–96 (internal quotation marks and citations omitted). The prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 896 (internal quotation marks and citation omitted).

*Barnett v. Luttrell*, 414 F. App'x 784, 787–88 (6th Cir. 2011).

The Sixth Circuit has also noted that in the context of deliberate indifference claims:

"[W]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where a prisoner alleges only that the medical care he received was inadequate, "federal courts are generally reluctant to second guess medical judgments." *Id.* However, it is possible for medical treatment to be "so woefully inadequate as to amount to no treatment at all." *Id.*

*Alspaugh*, 643 F.3d at 169. "A prisoner's allegation that a prison has failed to treat [a prisoner's] condition adequately . . . is evaluated under the effect-of-delay standard[,]" which "requires the submission of verifying medical evidence to establish "the detrimental effect of the delay in medical treatment." *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th Cir. 2017) (quoting *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citation omitted)). Additionally, "[o]rdinary medical malpractice does not satisfy the subjective component." *Grose v. Corr. Med. Servs, Inc.*, 400 F. App'x 986, 988 (6th Cir. 2010). Furthermore, "a difference of opinion between [a prisoner] and the prison health care providers and a dispute over the adequacy of [a prisoner's] treatment . . . does not amount to an Eighth Amendment claim." *Apanovitch v. Wilkinson*, 32 F. App'x 704, 707 (6th Cir. 2002).

Plaintiff must satisfy both the objective and subjective components to adequately state a claim for deliberate indifference. Indeed, failure to sufficiently plead just one of the components is dispositive. The Court addresses both the objective and subjective components in turn.

### i. Objective Component

As explained above, the objective component mandates that a plaintiff demonstrate a "sufficiently serious" medical need, "which is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Santiago*, 734 F.3d at 590 (internal citations omitted). A medical need so "obvious" that even a layperson would recognize it involves "life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem [whereas] delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute a [constitutional] violation." *Blackmore*, 390 F.3d at 897.

Plaintiff does not set forth a specific diagnosis, but rather offers the medical course of action taken after she was admitted to OSU to demonstrate a "sufficiently serious" medical need. (Plt.'s Resp., at pg. 8.) At OSU, Plaintiff underwent removal of her metal implant and wound revision surgery. (Dfts' Mot., Exhibit Y; Powers Depo., at pg. 5–6.) Plaintiff argues that Defendants' actions in "refusing to send [her] for further offsite treatment as the pain continued and increased, and as the metal became palpable, then became visible, was a continuing a [sic] course of treatment that was ineffective . . . ." (Plt.'s Resp., at pg. 8.) Plaintiff, though, mischaracterizes the uncontroverted facts. Defendants did not refuse to send her for further offsite treatment. Instead, upon her very first visit to the ORW infirmary complaining of head

problems, she was transported to OSU, given her history of aneurysm.[19] (Dfts' Mot., Exhibits L, M, & N.)

The staff at OSU found her head to be in normal condition without injury or abnormalities. (Dfts' Mot., Exhibit N.) Still, though, given her aneurysm history, OSU performed a CT scan and lumbar puncture. (*Id.*) The CT scan showed no problems and indicated there was no movement or protrusion of Plaintiff's metal implant. (*Id.*) The lumbar puncture findings did not demonstrate any intracranial hemorrhage. (*Id.*) OSU staff opined that Plaintiff was likely only suffering from a migraine and noted that she felt "improved after migraine cocktail." (*Id.*)

When Plaintiff made visits to the infirmary in May 2014 and June 2014, she was examined and provided with either pain medication (sometimes Tylenol #3, sometimes over-the-counter medications) and ORW staff cleaned her wound and advised her not to pick at her scalp. (Dfts' Mot., Exhibits P, T, & U; Crisan Decl., at ¶¶ 14–17.) On June 4, 2014, Plaintiff was examined by an ORW Nurse. This examination is the first documented instance of visible metal in her scalp. (Dfts' Mot., Exhibit Q.) On the same day, the nurse referred Plaintiff to Dr. Stromfeld who made a request for an outside neurological consultation. (Dfts' Mot., Exhibit R.) As the facts reveal, the prison medical staff has no control over an outside facility's scheduling, including OSU. (Crisan Decl., at ¶ 26; Eddy Rep., at ¶ 5.) Rather than "refusing to send Plaintiff for further offsite treatment," Defendants were in fact actively seeking such treatment on Plaintiff's behalf. This evidence undermines Plaintiff's assertions that Defendants were deliberately indifferent. *See Estelle v. Gamble*, 429 U.S. 97, 107–08 (1976) (holding that

---

[19] Plaintiff's visits to the infirmary before April 20, 2014 consisted only of complaints about hip pain. (Dfts' Mot., Exhibits D & E.)

plaintiff, a *pro se* prisoner, who had been seen and treated by medical personnel on 17 occasions within a three-month period had not stated a sufficient cause of action of deliberate indifference against physician).

On June 26, 2014, when Defendant Crisan returned from vacation, she was newly assigned to be the interim CMO for ORW. (Crisan Decl., at ¶ 20.) As part of her duties as the CMO, she presented consultation requests for outside specialists to the Collegial Review. (*Id.* at ¶ 21.) On the day Defendant Crisan returned to work, June 26, 2014, she examined Plaintiff's scalp once again so that she could explain the change in Plaintiff's medical condition to the Collegial Review. (Crisan Decl., at ¶¶ 23–24.) Upon examining Plaintiff's scalp, Defendant Crisan agreed with Dr. Stromfeld that the consultation should be designated "as soon as possible." (*Id.* at ¶ 24.) Dr. Stromfeld, therefore, placed a new consultation request on the same day (June 26, 2014). (Plt.'s Resp., Exhibit 6; Crisan Decl., at ¶ 24.) Collegial Review approved the request, also on June 26, 2014. (Crisan Decl., at ¶ 25; Dfts' Mot., Exhibit W.) Prior to Plaintiff's scheduled appointment at OSU, she "was provided interim care by ORW staff which included antibiotics to prevent infection of the wound and pain management." (Crisan Decl., at ¶ 27; Dfts' Mot., Exhibits U & X.) Plaintiff's arguments that Defendants "refused to send her for further offsite treatment" are, therefore, simply not borne out by the evidence.

Furthermore, because Plaintiff alleges that her medical condition was not adequately treated, she must submit "verifying medical evidence" to show the detrimental effect of the delay in medical treatment. As explained above, Plaintiff originally provided only two unsigned Affidavits, one from herself and one from a Dr. Yablonsky, who did not examine Plaintiff. (Pummell Aff.; Yablonsky Aff.) Plaintiff's Affidavit provided no additional information beyond what was stated in her Complaint and Response in Opposition. (*See generally* Compl.; *see*

*generally* Plt.'s Resp.; *see generally* Pummell Aff.)  Other than the Affidavits, Plaintiff provided

some ORW materials and medical records.  (Plt.'s Resp., Exhibits 3–7.)  Plaintiff provided no

evidence indicating that Defendants refused to provide her adequate medical care at any time.  In

short, this evidence, or rather lack thereof, establishes that even if Defendants delayed or refused

to provide Plaintiff medical treatment concerning her metal-head implant, Defendants actions did

not cause a serious medical injury.  *See Anthony*, 701 F. App'x at 463–64 (holding that because

plaintiff did not come forward with any medical testimony his claims could not succeed as a

matter of law); *Santiago*, 734 F.3d at 590–91 (concluding that when a plaintiff does not allege

that he received no medical treatment, but rather that he was delayed in receiving a specific type

of treatment, medical testimony is required).

Plaintiff also fails to offer evidence indicating that "even a lay person would easily

recognize the necessity for a doctor's attention."  *Santiago*, 734 F.3d at 590 (internal citations

omitted).  As explained above, Plaintiff would have had to demonstrate that her medical

condition involved "life-threatening conditions or situations where it is apparent that delay would

detrimentally exacerbate the medical problem [whereas] delay or even denial of medical

treatment for superficial, nonserious physical conditions does not constitute a [constitutional]

violation."  *Blackmore*, 390 F.3d at 897.  Plaintiff's medical need was not life-threatening, nor

would it have been apparent that delay would detrimentally exacerbate the medical problem.  For

example, Dr. Powers, who treated Plaintiff while she was at OSU, testified that the surgery for a

metal implant that is protruding or beginning to protrude through the skin is "considered an

elective surgery."  (Powers Depo., at pg. 11.)  He further stated that "[i]t's not an emergency that

needs to be done within six hours or one hour or something like that."  (*Id.*)  While he did state

that he would "want to do it within a week" after first observing "impending or threatened

erosion of the skin," Defendants made multiple attempts to schedule an appointment for Plaintiff at OSU upon their examinations of her scalp. (Dfts' Mot., Exhibits R & T; Crisan Decl., at ¶¶ 16, 20–26; Eddy Report, at ¶ 5.) Indeed, the incident causing the most exacerbation to the medical problem was Plaintiff's own "picking" at her scalp, which hastened the metal implant's breaking through of her skin. (*See* Dfts' Mot., Exhibits P & X; Crisan Decl., at ¶ 16.) Furthermore, at no point in time did Plaintiff suffer from a systemic or life-threatening infection. (Stevenson Decl., at ¶ 14.) Accordingly, the Court concludes that Plaintiff's medical need was not life-threatening, nor would it have been apparent to a lay person that delay would detrimentally exacerbate the medical problem.

Under these circumstances, the Court concludes that Plaintiff has failed to adduce sufficient evidence of a serious medical need for purposes of the objective component of the deliberate indifference analysis.

### ii. Subjective Component

Even if Plaintiff had satisfied the objective component, she does not meet the subjective component of her claims against Defendants, which requires a showing from Plaintiff that, "(1) 'the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner'; (2) the official 'did in fact draw the inference'; and (3) the official 'then disregarded that risk.'" *Anthony*, 701 F. App'x at 463 (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). In short, Plaintiff must allege that each Defendant subjectively perceived a substantial risk of serious harm and disregarded that known risk in his or her treatment. *Blackmore*, 390 F.3d at 896. Furthermore, Plaintiff "must state a plausible constitutional violation against each individual defendant—the collective acts of defendants cannot be ascribed

to each individual defendant." *Reilly v. Vadlamudi*, 680 F.3d 617, 626 (6th Cir. 2012) (citations omitted).

The Court cannot conclude that Plaintiff has adduced sufficient evidence that Defendant Crisan was aware that Plaintiff would be subjected to a substantial risk of serious harm if she did not receive immediate medical care at OSU. Plaintiff asserts only one allegation against Defendant Crisan in her Complaint—that Defendant Crisan referred Plaintiff to Mental Health without examining her head and commented that Plaintiff was "just seeking meds." (Compl. at ¶ 16.) Yet, when called upon to present evidence to support this allegation, Plaintiff falls woefully short. As indicated by ORW medical documentation, Defendant Crisan thoroughly examined Plaintiff's head based on her complaints. (Dfts' Mot., Exhibit P.) Defendant Crisan did also voice mental health concerns, but these were appropriate given Plaintiff's medical history. (Dfts' Mot, Exhibit C; Crisan Decl., at ¶ 16.) Additionally, Defendant Crisan's voicing of concerns regarding Plaintiff's potential drug-seeking behavior were appropriate given Plaintiff's drug use history. (Dfts' Mot., Exhibits A & C; Crisan Decl., at ¶ 15–16.) Furthermore, "addiction and mental health issues are one of the most prevalent concerns within the corrections medical setting." (Crisan Decl., at ¶ 15.) Accordingly, Plaintiff has not sufficiently alleged that Defendant Crisan was aware that Plaintiff would be subjected to a substantial risk of serious harm if she did not receive immediate medical care at OSU.

Indeed, "federal courts are generally reluctant to second guess medical judgments." *Alspaugh*, 643 F.3d at 169. Moreover, even if Plaintiff could demonstrate that Defendant Crisan's treatment amounted to medical malpractice, such malpractice is not sufficient to establish the subjective prong of Plaintiff's claim and does not rise to the level of a constitutional violation. *Hearington v. Pandya*, No. 16-1145, 2017 WL 2080273, at *3 (6th Cir. May 15,

2017) ("'Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'") (quoting *Estelle*, 429 U.S. at 106); *Payne v. Hamilton Cty. Jail Sheriff's Staff*, No. 1:16-cv-426, 2016 WL 6585579, at *3 (E.D. Tenn. Nov. 7, 2016) (finding that the plaintiff failed to satisfy the subjective component where the defendant determined that the plaintiff's ankle was sprained and that no further medical care was necessary even though it was later found that the plaintiff's ankle was broken). Accordingly, to the extent Defendant Crisan failed to obtain immediate medical care for Plaintiff at OSU, her actions do not rise to the level of a constitutional violation. *Santiago*, 734 F.3d at 591 (quoting *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)) ("'[W]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.'").

Even if Plaintiff could show that Defendant Crisan's assessments and treatments of her medical needs differed from Plaintiff's preferred course of action, this would be insufficient to support a showing of deliberate indifference. *See White*, 94 F. App'x at 264 (citations omitted) (doctor's refusal to prescribe inmate's preferred medications "amounted to only negligence or a difference of opinion" rather than "a deliberate indifference to his medical needs"); *Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003) (holding that inmate and medical provider's disagreement "over the preferred medication to treat [inmate's] pain . . . does not support an Eighth Amendment claim" and noting that "[t]he district court properly declined to second-guess [the doctor's] medical judgment"); *Apanovitch*, 32 F. App'x at 707 ("[A] difference of opinion between [a prisoner] and the prison health care providers and a dispute over the adequacy of [a prisoner's] treatment . . . does not amount to an Eighth Amendment claim.").

Likewise, the Court concludes that Plaintiff has failed to come forward with evidence that Defendant Pennington was personally involved in the alleged unconstitutional conduct. To establish liability under 42 U.S.C. § 1983, "a plaintiff must plead and prove that a defendant is *personally* responsible for the unconstitutional actions which injured [her]." *Balderson v. Mohr*, No. 2:12-cv-00235, 2012 WL 1552776, at *1 (S.D. Ohio May 1, 2012) (emphasis added) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978)). As noted above, "the collective acts of defendants cannot be ascribed to each individual defendant." *Reilly*, 680 F.3d at 626. Regarding Defendant Pennington, Plaintiff alleges she sent him complaints, known as kites, about her medical treatment at ORW on May 26, 2014 complaining Defendant Crisan did not examine her head, and June 2, 2014 complaining the infirmary did nothing for her headaches and metal implant. (Compl. at ¶¶ 17, 20.)

Plaintiff further alleges that Defendant Pennington responded to her May 26, 2014 complaint with "Don't worry, you've been referred to Mental Health" and to her June 2, 2014 complaint with an advisement to make an appointment with a doctor if the problem persists. (*Id.*) Even if the Court were to accept that these incidents occurred as Plaintiff alleges, despite that she fails to put forward sufficient evidence, the involvement by Defendant Pennington is insufficient to trigger liability under 42 U.S.C. § 1983. *See Barnett v. Luttrell*, 414 F. App'x 784, 787 (6th Cir. 2011) ("Prison officials are not liable under § 1983 for denying or failing to act on grievances.") (citation omitted); *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (holding that § 1983 liability "must be based on more than respondeat superior, or the right to control employees") (citation omitted).[20] Additionally, the United States Court of

_____

[20] Furthermore, "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a

Appeals for the Sixth Circuit has upheld the principle that "lay officials may generally rely on medical [staff's] judgments." *Mitchell v. Hininger*, 553 F. App'x 602, 607 (6th Cir. 2014) (citing *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009)). Defendant Pennington was a Health Services Administrator at ORW, which is an administrative position, not a medical one. (Pennington Decl., at ¶¶ 1, 3–5.) Health service administrators may rely on the judgment of medical professionals. *McCauley v. Sator*, No. 3:11-cv-361, 2012 WL 2357480, at *7 (M.D. Tenn. June 20, 2012) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). Accordingly, Plaintiff's allegations against Defendant Pennington are insufficient to trigger liability under 42 U.S.C. § 1983.

Even construing the facts in the light most favorable to Plaintiff, no reasonable jury could conclude that Defendants acted with deliberate indifference in treating her medical conditions. The evidence presented establishes that Defendants actively and adequately addressed Plaintiff's conditions, or were not personally involved in her medical care.

### E. Qualified Immunity

Defendants are also entitled to qualified immunity with respect to their treatment of Plaintiff. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

---

completed act of misconduct does not." *George v. Smith*, 507 F.3d 605, 606–07 (7th Cir. 2007).

rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d

531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"[Q]ualified immunity applies regardless of whether the government official's error is a

mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*

(internal quotation marks and citations omitted). The determination of whether a government

official is entitled to qualified immunity is a two-part inquiry. *Miller v. Sanilac County*, 606

F.3d 240, 247 (6th Cir. 2010). "First, viewing the facts in the light most favorable to the

plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the

right clearly established at the time of the violation?" *Id.* (internal quotation marks and citations

omitted). The Court need not consider these questions sequentially. *Jones v. Byrnes*, 585 F.3d

971, 975 (6th Cir. 2009) (citation omitted). "Once it is determined that the right is clearly

established, the [C]ourt must determine 'whether the plaintiff has alleged sufficient facts

supported by sufficient evidence to indicate what [the defendant] allegedly did was objectively

unreasonable in light of [the] clearly established constitutional rights.'" *Dickerson v. McClellan*,

101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.

1994)).

Here, Plaintiff has not adduced sufficient evidence to create a genuine issue of material

fact as to whether Defendants acted objectively unreasonably in light of clearly established law.

As set forth above, those Defendants who were personally involved actively treated Plaintiff's

conditions by repeatedly examining and addressing Plaintiff's medical needs. Although the right

to be free from deliberate indifference in the provision of medical care was clearly established,

Defendants' actions were not contrary to clearly established law given the continuous and

medically appropriate care that Plaintiff received. *See Mitchell v. Schlabach*, 864 F.3d 416, 424

30

(6th Cir. 2017) ("The Supreme Court very recently reminded the lower courts that an officer's actions are against clearly established law for purposes of qualified immunity only when existing precedent . . . place[s] the statutory or constitutional question beyond debate.") (internal quotations and citations omitted).  Plaintiff's dispute over the adequacy of her care does not amount to an Eighth Amendment claim.  *Apanovitch*, 32 F. App'x at 707.  The Court finds, therefore, that Defendants are entitled to qualified immunity.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 64) is **GRANTED**.  The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of Defendants.

**IT IS SO ORDERED.**


**Date: March 21, 2019**                                **/s/ *Elizabeth A. Preston Deavers***
                                                        **ELIZABETH A. PRESTON DEAVERS**
                                                        **CHIEF UNITED STATES MAGISTRATE JUDGE**